Filed 8/26/20  P. v. Maffy CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>STEPHAN MAFFY,<br><br>      Defendant and Appellant. | A156043<br><br>(Sonoma County<br>Super. Ct. No. SCR7004191) |

Defendant Stephan Maffy was convicted of a number of sex crimes involving a highly intoxicated woman.  He maintains the court erred in admitting a video recording of part of the sexual assault, as well as evidence of a pornographic magazine found in his truck.  Defendant also claims the court erred in not holding an evidentiary hearing and denying his motion for new trial based on alleged jury misconduct.  Lastly, he asserts the court erred in imposing a consecutive sentence as to one count.

We affirm.

## BACKGROUND

In March 2017, the victim, Jane Doe, and her friends Carol and William[1] joined a rowing club of which defendant was a member.  About a

---

[1]  To protect personal privacy interests, we refer to witnesses by their first names or initials.  (Cal. Rules of Court, rule 8.90(b).)

1

week after Jane went to her first practice, William invited her to lunch with him, Carol and defendant.

The group went to a restaurant, where they were met by Victor, another member of the rowing club. Someone ordered food and beer for the table. The group stayed at the restaurant about four to five hours, eating and drinking. They collectively consumed about eight pitchers of beer.

At some point, their waitress noticed defendant touch Jane Doe's buttocks and put his hand under her dress. Jane Doe did not react. Jane Doe's friend William also noticed defendant rubbing her back and talking in her ear.

William went outside with Jane Doe for a smoke break, and warned her some men took her friendliness in a social situation "the wrong way." Jane Doe laughed and responded "that's not what she was trying to do" saying " '[h]e's old enough to be my dad.' " Other than "push[ing] him off," William did not see Jane Doe touch defendant.

Between 5:30 and 6:00 p.m., the waitress asked the group to leave because they were "a little too rowdy" and loud. William noticed Jane Doe appeared intoxicated. The group decided to go to Carol's house, which she shared with her boyfriend F.E. Carol called F.E. to pick her up, and he offered to cook dinner.

When F.E. arrived, he observed that Jane Doe seemed drunk. F.E. drove Carol and William back to his and Carol's house. Because defendant "didn't know the address, [] we just told [Jane Doe] to . . . go with him 'cause she knew how to get to Carol's house."

After everyone arrived at F.E. and Carol's house, Jane Doe went upstairs to F.E.'s bedroom because she was tired. William followed and found

2

Jane Doe lying on the bed and Carol sitting on the bed. Defendant was in the kitchen.

William and Carol went to a second bedroom to ask F.E. if he would get more food for dinner. He agreed, and the three of them went downstairs. F.E. left for the store, and Carol and William told defendant and Victor to help themselves to some alcohol. Carol and William then returned to F.E.'s bedroom where Jane Doe was asleep, got into bed with her and also fell asleep.

When F.E. returned with the food about 20 minutes later, no one was downstairs, so he went upstairs to his bedroom. The door was open, and he saw defendant orally copulating Jane Doe. She was "motionless, with her legs being propped up by the defendant." Carol and William were asleep on the bed.

F.E. was "in shock" but "assumed they were boyfriend and girlfriend just fooling around inappropriately." He had not met defendant or Jane Doe before that day. He stepped back from the room, and then announced " 'Hey guys, I'm here.' " There was no response. Jane Doe "seemed unconscious," and did not move. F.E. saw defendant insert his finger into Jane Doe's vagina. He also saw defendant move Jane Doe's "lifeless" body onto her stomach and orally copulate her anus.

F.E. began filming the incident with his phone.[2] Defendant was moving his head in between Jane Doe's legs in a "rough" manner. F.E. ordered defendant to get off the floor and stop what he was doing. Jane Doe "didn't realize exactly what was going on," and apologized. She seemed disoriented, "spinning and didn't know where she was," and F.E. "had to lead

_____

[2] The cellphone video recording was admitted into evidence.

3

her to the bathroom" because she was "wobbling." Defendant tried to follow her in, but F.E. told him to stop.

F.E. followed defendant downstairs and "lectured" him about his behavior and "[h]ow inappropriate it was for him to take advantage of somebody's home who's welcoming him in." When Jane Doe came down the stairs, she appeared "[d]isoriented." Defendant appeared "stone cold sober."

F.E., still assuming defendant and Jane Doe were in a relationship, told the two to "talk about their mistake," which he thought was "a relationship issue." Jane Doe still seemed disoriented.

F.E. went upstairs for about five minutes. When he returned, he saw Jane Doe "with her legs propped up in the air on my couch" and defendant "performing oral sex" on her in a "more aggressive" manner than in the bedroom. Defendant was also penetrating Jane Doe's vagina with his fingers, while Jane Doe remained motionless.

F.E. "raised [his] voice and told them to leave my house." Jane Doe was "spinning . . . like a scared cat," "looking for the exit" and left. F.E. then told defendant to " 'get out,' " and because he still thought Jane Doe and defendant were in a relationship, he pointed out the direction Jane Doe had gone.

Jane Doe testified she did not remember how much alcohol she had to drink at the restaurant. She normally does not become loud when intoxicated, but she was singing at the restaurant. She recalled going to the bathroom and being "very unstable on [her] feet." At that point, she realized she was "pretty drunk." Jane Doe did not recall what happened after being in the bathroom until she arrived at Carol's house in defendant's vehicle.

When they arrived at Carol's house, Jane Doe went upstairs because she wanted to go to sleep. She fell asleep fully clothed.

4

The next thing Jane Doe remembered was waking up with defendant on top of her. After that, her next memory was walking out the front door by herself when it was dark outside.

The next thing she recalled was being in defendant's pickup truck. Jane Doe testified she believed she "was coming to. I knew I was in the car and that there was only the defendant and I didn't know where we were going or . . . how I got into the car," but she did not want to be in the truck with defendant. Jane Doe called her niece and asked her to meet her at a bar, because she did not know where she was or how to give her directions. Jane Doe was crying because she "realized [she] didn't have any underwear on and [she] remember[ed] going to bed with them." Defendant was driving, and told her to put her phone away. He told her they "were going to get a hotel room . . . and that [she] should have his babies."

At that point, Jane Doe was "even more scared" and "trying to figure out how to get out of the car." She "played to him a bit" and suggested they stop for coffee at a convenience store. They went into the store, where Jane Doe was able to order an Uber on her phone to take her to the bar. While in the store, Jane Doe noticed defendant's hands were bloody. When the Uber arrived, she "walked right out of there into the Uber" and started crying. Jane Doe no longer felt intoxicated.

When she arrived at the bar, Jane Doe went to the restroom and noticed she had been bleeding. She was in pain and "very uncomfortable." Jane Doe's niece arrived, and they drank beer and talked about the incident. Jane Doe told her about her experience in the truck, and that she was bleeding and her underwear was missing. Her niece dropped her off at her house around 2:00 a.m.

Jane Doe was supposed to be at work at 7:00 a.m. that morning.

The woman running the company where she worked, who was also Jane Doe's "cousin by marriage," called her around 10:00 a.m., and said she was coming to pick her up. After meeting with Jane Doe, the woman drove her to the police station.

A physician's assistant conducted a Sexual Assault Response Team examination of Jane Doe at a local hospital. The examination revealed injuries in Jane's anal and genital areas. She had a number of bruises and lacerations, including "a large area of lacerated skin with abrasions," and "two small one centimeter lacerations" on her anus that were "actively bleeding" at the time of the exam. The physician's assistant testified the injuries were "consistent with being caused by a finger or fingernail" and could not have occurred "just with natural day to day living."

Defendant testified he attended the group lunch at the restaurant and. drank between five and 10 beers over the course of the afternoon. He and Jane Doe "were both flirting with each other." He was touching Jane Doe's back and she was "rubbing on [his] inner thighs."

After the group was asked to leave, he and Jane Doe left in his truck. When the other car they were following stopped at a gas station, he and Jane Doe kissed. She appeared drunk, but he thought she was "in control." According to defendant, they discussed "having a private time together," in order to engage in sexual acts.

When they arrived at Carol and F.E.'s home, the group went into the kitchen. Jane Doe "motioned" to defendant that she was going upstairs. He believed she was signaling for him to "come in later."

After F.E. left to buy food, defendant went upstairs and found Jane Doe, Carol and William laying on the bed. Defendant "tapped [Jane Doe] on the shoulder . . . just to tell her [he] was there," and they started "making

out." Jane Doe did not appear "overly intoxicated" to him. They got "carried away," and Jane Doe removed her panties, which indicated to defendant "she was agreeing with everything that was happening." They knew Carol and William were sleeping, so they got on the floor. Defendant orally copulated Jane Doe and put his fingers in her vagina. He testified he asked her if she wanted to in Fijian, and she said yes.

F.E. then "called out" to them. Defendant and Jane Doe both stood up and Jane Doe went to the bathroom. Defendant tried to follow her into the bathroom "to see if she was okay," but did not go in. Jane Doe then went downstairs and defendant stayed upstairs with F.E. for a while. Defendant was under the impression F.E. was "not okay with [him] continuing to have sexual relations with [Jane Doe] in his house."

Defendant then went downstairs, saw Jane Doe on the couch, and started talking to her. Jane Doe told him to "stop with the talking and just carry on with it and directed [his] head to her crotch." Defendant thought she wanted him to orally copulate her. F.E. saw him engaged in oral copulation and told them to "get out of his house."

Defendant and Jane Doe left together in his truck. Jane Doe did not appear overly intoxicated, and seemed "fine" with his suggestion of getting a hotel room. Jane Doe's demeanor changed when she called someone on her phone, and she told him "she wanted to call it a night." They stopped at a convenience store for coffee, and she exited the store first. When defendant left the store, Jane Doe was gone.

The Sonoma County District Attorney charged defendant with two counts of oral copulation of an intoxicated person, (Pen. Code, § 288a,

subd. (i))[3] sexual penetration of an intoxicated person, (§ 289, subd. (e)) two counts of oral copulation of an unconscious person, (§ 288a, subd. (f)) sexual penetration of an unconscious person, (§289, subd. (d)) and misdemeanor sexual battery (§243.4, subd. (e)(1)).

A jury found defendant not guilty of the three counts alleging sex crimes against an unconscious person but found him guilty of the remaining counts. The court sentenced defendant to a total term of 12 years.

## DISCUSSION

### *Admission of the Cell Phone Video*[4]

Defendant claims that "as an invited guest in the upstairs bedroom [he] had a reasonable expectation of privacy not to be recorded in a sexual act." (Capitalization omitted.) He maintains F.E.'s cell phone video recording of him therefore violated section 632, rendering it inadmissible.

Section 632 provides in part: "(a) A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication . . . shall be punished. [¶] . . . [¶] (c) For the purposes of this section, 'confidential communication' means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering . . . , or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded. (d)

---

[3] All further undesignated statutory references are to the Penal Code.

[4] We review evidentiary rulings for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717–718.)

8

Except as proof in an action or prosecution for violation of this section, evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section is not admissible in any judicial, administrative, legislative, or other proceeding." (§ 632, subds. (a), (c), (d).)

Defendant cites no case which suggests, let alone concludes, that an individual has a reasonable expectation of privacy while a guest in another's home, when he enters the host's bedroom without invitation to sexually assault one of a group of people sleeping there. Nor do we need to decide the issue, given a recent decision by the California Supreme Court.

In *People v. Guzman* (2019) 8 Cal.5th 673 (*Guzman*),[5] the court considered the interplay between section 632 and the "Right to Truth-in-Evidence" provision of the California Constitution (also referred to as Proposition 8).[6] (*Guzman,* at p. 677.) In that case, the defendant was convicted of two counts of committing a lewd and lascivious act on a child. (*Id.* at p. 676.) The prosecutor introduced a transcript of a recording of a telephone conversation between the defendant's niece and the victim's mother which defendant maintained was inadmissible under section 632, subdivision (f). (*Guzman,* at pp. 677–678.)

---

[5] Both parties noted in their briefs the Supreme Court had granted review in *Guzman*, but the case was not filed until after briefing was complete.

[6] "Enacted as part of Proposition 8 in 1982, the provision instructs that '[e]xcept as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding. . . .' (Cal. Const., art. I, § 28, subd. (f)(2).)" (*Guzman*, *supra*, 8 Cal.5th at p. 677.)

The court considered whether "the Right to Truth-in-Evidence provision abrogated the exclusionary remedy of section 632(d) as that remedy applies to criminal proceedings." (*Guzman, supra*, 8 Cal.5th at p. 679.) It concluded "[m]erely because an exclusionary remedy is codified does not mean that it is beyond the reach of the Right to Truth-in-Evidence provision" (*id.* at p. 682), rejecting the defendant's claim " 'the right to privacy outranks the right to truth-in-evidence' and hence section 632(d) must be given effect regardless of Proposition 8." (*Id.* at pp. 683–684.) "Although '[i]n enacting [the Invasion of Privacy Act] the Legislature declared in broad terms its intent "to protect the right of privacy of the people of this state," ' this does not mean that [the] substantive right of privacy—that enshrined in article I, section 1 of our state Constitution—is coextensive with the exclusionary remedy codified in section 632(d)." (*Id.* at p. 684.) Proposition 8 thus "abrogated section 632(d) and the Legislature has not acted since to overcome the effect of the proposition." (*Id.* at p. 692.) Accordingly, "the exclusionary provision of section 632(d) posed no bar to the admission of the recording at defendant's criminal trial." (*Ibid.*)

Under *Guzman,* regardless of whether the cell phone video was made in violation of section 632, the trial court did not abuse its discretion in admitting it.

### Admission of Pornographic Magazine Covers

Police found a pornographic magazine entitled "Buttman" in defendant's vehicle. At trial, defendant objected to its admission on relevance and Evidence Code section 352 grounds. Defense counsel agreed, however, she was "fine with the detective saying, I located this [magazine]." The prosecutor, in turn, maintained the "acts that occurred here—it's the only magazine that was located in the truck that he transported Jane Doe in and

10

it depicts the very acts that he perpetrated allegedly on Jane Doe.  So we believe that that goes to motive."

The trial court concluded evidence of the magazine was relevant, but its contents were more prejudicial than probative.  Accordingly, the court allowed the prosecutor to "introduce the existence of the magazine and offer it including the front and the back of the magazine as giving a flavor for the much more graphic and numerous images that are on the inside of the magazine."  It also allowed the officer who found the magazine to summarize the types of images in it.   Thus, the court explained, the prosecution could "go into some detail, although I would ask them to be somewhat circumspect, about the content because without the content they really do lose a lot of the relevance of the item.  To the extent that it is unnecessarily excessive, I'll entertain an objection and we can have a further discussion side bar, but I do think it's fair game, and I think doing it in this way where it comes though testimony of an officer is sufficient to insulate against the unfair prejudice that could result from the Jury going through the magazine page by page.  So that's the balancing that the Court is going to make given the competing interests here."

Accordingly, the officer testified, without objection by the defense, about the contents of the magazine as follows:  "[i]t was called Buttman and it depicted scenes of males and females engaging in anal copulation, sodomy, those types of acts."  As to the magazine, itself, the jury was allowed to view the front and back covers.  The front cover depicts two women dressed as nuns with their buttocks exposed, while the back cover features one woman exposing her buttocks and part of her genitals.  The court further restricted the jury's view by placing the magazine in a plastic evidence envelope that partially obscured the images on the covers.

11

On appeal, defendant contends the magazine, itself, was not relevant to any issue in the case, inadmissible under Evidence Code section 1101 to prove disposition or conduct, and more prejudicial than probative. Because he did not raise Evidence Code section 1101 in the trial court, he has forfeited this issue on appeal. (*People v. Doolin* (2009) 45 Cal.4th 390, 434.)

With respect to relevance, defendant maintains the magazine "was not relevant to [Jane] Doe's level of intoxication or consciousness when the acts occurred," relying on *People v. Page* (2008) 44 Cal.4th 1 (*Page*). He claims that in *Page*, the Supreme Court "found admission of such pornographic magazines irrelevant." However, this misstates the high court's holding.

In *Page*, the defendant was convicted of murder and commission of a lewd act on a child. (*Page*, *supra*, 44 Cal.4th at p. 5.) The trial court admitted three pornographic magazines it characterized as " 'pseudochild pornography,' " concluding the magazines were relevant to demonstrate that defendant had an interest in young girls. (*Id*. at p. 39.) It also noted the picture on the cover of one of the magazines looked very similar to the victim. (*Ibid*.) The trial court therefore ruled, "the three pornographic magazines were 'relevant to show motive, intent and identity,' " and concluded the probative value of the three magazines outweighed their prejudicial effect under Evidence Code section 352. (*Page,* at p. 39.)

In considering whether the trial court erred in admitting the magazines, the *Page* court recognized that while " 'evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion.' . . . Such evidence is admissible . . . 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful

12

sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.' " (*Page*, *supra*, 44 Cal.4th at p. 40, quoting Evid. Code, § 1101, subds. (a)–(b).)  It noted that "[i]n certain circumstances, evidence of sexual images possessed by a defendant has been held admissible to prove his or her intent," or interest in a particular sexual act.  (*Page*, at p. 40.)

The *Page* court concluded the admitted magazines "may have been probative with respect to defendant's commission of the crimes, but they had less probative value than the [pornographic] images considered in prior cases." (*Page*, *supra*, 44 Cal.4th at p. 40.)  The court noted "none of the models whose photographs were staged to make them look younger than their age appeared to be as young as the victim, and defendant did not involve children in the production of pornographic images. . . .  Although the assault upon [the victim] was violent, the acts committed against her and the acts portrayed in [the bondage-related] magazine were not similar."  (*Ibid*.)

While the *Page* court questioned the relevancy of the pornographic magazines, it did not resolve the question "because defendant fails to establish that the admission of the magazines was prejudicial error."  (*Page*, *supra*, 44 Cal.4th at p. 41.)

So too here.  We need not decide whether the trial court abused its discretion in admitting the magazine covers for the same reason—because any error was not prejudicial.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

To begin with, defendant made no objection to the officer's testimony that he found the magazine in defendant's truck or to his characterization of its contents.  Thus, the covers of the magazine, itself, were largely redundant.

Furthermore, the evidence was overwhelming that Jane Doe was so intoxicated she was barely functional, and that defendant performed sexual acts on her while she was in such state. As we have recited, numerous witnesses testified to Jane Doe's state of inebriation after a long afternoon of heavy drinking. The jury also heard graphic testimony about and viewed graphic evidence in the form of the cell phone recording and photographs of Jane Doe's injuries taken during the SART examination, as to defendant's sexual assault of Jane Doe. F.E. testified as to what he observed when he went up to the bedroom and saw defendant orally copulating an "unconscious" and "lifeless" Jane Doe in a "rough" manner. He recorded the incident on his phone and chastised defendant. The recording was admitted into evidence.[7] F.E. also testified as to the second incident, in which he again observed defendant orally copulating Jane Doe after he had yelled at him about his behavior. Jane Doe also testified, not only about her barely conscious state, but also about how she felt when she emerged from her alcohol stupor and her efforts to escape defendant.[8]

In short, there is no reasonable probability defendant would have achieved a more favorable result but for the admission of the partially obscured covers of the pornographic magazine.

---

[7] Indeed, defendant maintains evidence of this video recording was so prejudicial that its admission requires reversal.

[8] Defendant claims the jury's not guilty verdicts on three counts demonstrate this was a close case. Not so. The not guilty verdicts were as to the charges for oral copulation and sexual penetration of an *unconscious* person. The jury plainly determined, by its guilty verdicts for oral copulation and sexual penetration of an *intoxicated* person, that the close issue was whether Jane Doe could not consent because she was unconscious or because she was intoxicated.

Defendant nevertheless insists he was "substantial[ly]" prejudiced, given the prosecutor's questioning and her closing argument.[9]

The prosecutor asked defendant, "Isn't it true you have a magazine called Buttman magazine? Isn't that your magazine?" However, there was no objection, and defendant responded affirmatively. The prosecutor went on to ask, "[I]s there a particular reason why you chose Buttman Magazine?" Defendant answered, "No." The prosecutor followed up by asking, "So the fact that it depicts oral sex and anal sex isn't something that you're interested in?" Defendant against answered, "No." The prosecutor then asked, "So you chose a sex magazine of acts that you're not interested in?" After defense counsel unsuccessfully objected as being asked and answered, defendant answered: "Well, it's–it's more like just a sex magazine and it's the reason why." The prosecutor later asked, "Could it be when you were–before you even left [the bar] and you were looking at your Buttman magazine[¶] . . . [¶]–that you decided this is an act you would like to perform that day?" Defense counsel again objected, and the court sustained the objection and struck the answer.

In the rebuttal closing argument, the prosecutor stated: "I do know it was the defendant who wanted to have the sex. He had the magazines. He initiated the contact." "He possessed a magazine depicting specific sexual acts that occurred in this case." "He wanted to have oral and anal sex. He possessed a magazine depicting the acts. [¶] . . . [¶] He must have been licking his chops and saying, boy, howdy, how lucky am I, everybody is asleep, Jane Doe is passed out, this is where I pounce, I'm in a relationship, I'm not

---

[9] Defendant made no objection to this portion of the prosecutor's closing argument at trial and makes no claim on appeal that it constituted misconduct.

getting what I want, I can get what I want, and what do I want, Buttman magazine, I want to live out that. . . ."

Neither the questioning by the prosecutor nor her closing argument begins to demonstrate prejudicial error in allowing the magazine covers into evidence, particularly given the officer's testimony about the contents of the magazine, to which defendant never objected.

Nor, contrary to defendant's claims, were the magazine covers particularly "inflammatory." Defendant, himself, characterizes the magazine as " 'just regular pornography,' not a crime in and of itself." In fact, he concedes in his reply brief the images on the covers were not prejudicial. ("[T]he prejudice stemming from introduction of the Buttman Magazine was not from images depicted on the cover of the magazine.") In short, the trial court did not abuse its discretion in excluding the contents of the magazine as unduly inflammatory, and allowing only the covers of the magazine to be put before the jury.

### Motion for New Trial Based on Alleged Juror Misconduct

Defendant also maintains the trial court erred in failing to hold an evidentiary hearing in connection with his new trial motion based on juror misconduct and supported by several affidavits.

Section 1181 provides for a new trial "When the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property; . . . When the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented; . . .[or] [w]hen the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all the jurors." (§ 1181, subds. (2–4).)

16

" 'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry.  The court must first determine whether the affidavits supporting the motion are admissible.  [Citation.]  If the evidence is admissible, the court must then consider whether the facts establish misconduct.  [Citation.]  Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial.  [Citations.]  A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion.' " (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467.)

In determining the admissibility of such affidavits, the trial court must take into account Evidence Code section 1150, which states:  "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."  (Evid. Code, § 1150, subd. (a).)

Further, a trial court generally " 'does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay.' " (*People v. Bryant, supra,* 191 Cal.App.4th at p. 1468.)

"The trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct.  [Citation.]  'Defendant is not, however, entitled to an evidentiary hearing as a matter of right.  Such a hearing should be held only

17

when the court concludes an evidentiary hearing is "necessary to resolve material, disputed issues of fact." [Citation.] "The hearing . . . should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).) The trial court's decision whether to conduct an evidentiary hearing on the issue of juror misconduct will be reversed only if the defendant can demonstrate an abuse of discretion. (*Id.* at p. 810.)

Defendant based his new trial motion on a claim the jury forewoman "used her expertise as a paralegal to take charge of the jury, and provide the law regarding the ability of one to give legal consent to the other jurors as she understood it, which was erroneous; she did not advance the law as was properly given by the Court."

The court ruled large portions of each declaration inadmissible, a ruling defendant does not challenge on appeal.[10] Defendant nevertheless largely relies on the inadmissible portions of these declarations in asserting the court erred in not holding an evidentiary hearing.

He asserts the following statements in the declaration of attorney Caitlin Van Loben Sels demonstrates misconduct: "11. The jury forewoman informed us several times that she had to keep explaining the law, as she understood it, to the other jurors." However, the court ruled "Paragraph 11 is hearsay and inadmissible under [Evidence Code section] 1150."

He claims two statements in the declaration of attorney Joel Fleck "averred an admission of misconduct by the jury foreperson." First, in

---

[10] Indeed, defendant concedes "The [trial] court considered [his] motion with due regard for the evidentiary constraints imposed by deference to the jury's deliberative process."

18

paragraph 13, Fleck declared "The jury forewoman stated that there were 'two of us who did not understand what knew or should have known or the legal definition of consent was.' " And, in paragraph 21 of Fleck's declaration, he stated: "Again, the jury forewoman indicated she would not allow discussion regarding how Mr. Maffy and Jane Doe went from the bed to the floor, stating that 'it was not put before us, we weren't told anything about it, so I kept having to tell them [the reluctant jurors] that we don't know and we can't talk about it." However, the trial court ruled both paragraphs were hearsay and inadmissible under Evidence Code section 1150.

Finally, he relies on a portion of paragraph 6 from juror J.R.'s declaration: "a) Earlier in the day, everyone had taken a vote that we would finish our deliberations by the end of the day. I did not raise my hand. b) It was clear that the other jurors expected to finish on August 8, 2018." Although the trial court ruled subsection (a) of paragraph 6 was admissible, it ruled the remainder of the paragraph was inadmissible under Evidence Code section 1150.

Thus, the only admissible portion of the declarations cited by defendant is paragraph 6 (a) of juror J.R.'s declaration, stating "Earlier in the day, everyone had taken a vote that we would finish our deliberations by the end of the day. I did not raise my hand." This statement does not begin to demonstrate a prima facie case of juror misconduct. As the trial court explained, "This Court had admonished the jurors before, during and after selection that there was no time limit on their deliberations. This act of voting could have simply been a method by which to structure discussions and manage time and would not have precluded the jury from taking another vote to extend the time for deliberation had the jury not come to a unanimous

19

conclusion within the time voted on which it did.  No basis for misconduct is demonstrated by this statement."

Thus, defendant has not demonstrated an evidentiary hearing was " ' "necessary to resolve material, disputed issues of fact." ' " (*Dykes, supra,* 46 Cal.4th at p. 809.)  Nor has he shown the admissible evidence demonstrated " ' "a strong possibility that prejudicial misconduct has occurred." ' "[11] (*Ibid.*)  Accordingly, the trial court did not abuse its discretion in declining to hold an evidentiary hearing or in denying the motion for new trial.

### *Consecutive Sentence as to Count Three*

The trial court imposed a two-year sentence as to count three, digital penetration of an intoxicated person, to run consecutively to the sentences for counts one and two, both for oral copulation of an intoxicated person. Defendant maintains this two-year term must be stayed under section 654.

Section 654 precludes multiple punishments for a single act or indivisible course of conduct.  (*People v. Hester* (2000) 22 Cal.4th 290, 294.)  It provides in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."  (§ 654, subd. (a).)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.

---

[11]  Because defendant has failed to demonstrate misconduct, there is no presumption of prejudice that must be rebutted.  (See *People v. Loker* (2008) 44 Cal.4th 691, 746–747.)

[Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Defendant claims his digital penetration of Jane Doe "was either preparatory or incidental to the oral copulation," and thus not a "separate course of conduct," relying on *People v. Madera* (1991) 231 Cal.App.3d 845 (*Madera*).

*Madera* involved "one undefined lewd act (touching or rubbing [the victim's] penis) committed in the same course of conduct as one or more defined code violations (oral copulation and/or sodomy)." (*Madera, supra,* 231 Cal.App.3d at p. 854.) Defendant relies on the following quotation from the case to support his claim that his digital penetration of Doe was merely incidental to oral copulation: "In our view, section 654 applies where the undefined sex act directly facilitates or is merely incidental to the commission of a defined lewd act. [Citation.] For example, section 654 would bar separate punishment for applying lubricant to the area to be copulated. In such a situation, the commission of the undefined act would have directly facilitated the commission of the defined act." (*Madera*, at p. 855.)

Defendant omits, however, the holding of the case: "In contrast, section 654 does not apply where, as here, the undefined act is 'preparatory' only in the general sense that it may be intended to sexually arouse either the perpetrator or the victim." (*Madera, supra*, 231 Cal.App.3d at p. 855.) "The fact that the touching or rubbing of [the victim's] penis preceded the oral copulation and/or sodomy, on the occasions when such additional violations occurred, does not establish that the touching of [the victim's] penis was

21

merely incidental to or facilitative of the later acts.  Certainly the acts denounced by sections 288a and 286 are capable of commission without an initial touching or rubbing of the victim's penis."  (*Ibid*.)

Likewise, here, oral copulation is capable of commission without an initial digital penetration.  As the trial court stated, "[w]hile arising from the same criminal venture, because each offense was a separate and distinct act and was not incidental to or the means by which any other offense was accomplished, each act may be punished separately."  We entirely agree with the trial court's assessment of the conduct.

## DISPOSITION

The judgment is affirmed.

_____

Banke, J.

We concur:


_____

Margulies, Acting P.J.


_____

Sanchez, J.


A156043, People v. Maffy